[Civ. No. 67290. Second Dist., Div. One. June 9, 1983.]

SAN GABRIEL TRIBUNE, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
CITY OF WEST COVINA et al., Real Parties in Interest.

COUNSEL

Flint & MacKay, Philip M. Battaglia, Paul L. Giannini and Stephen G. Contopulos for Petitioner.

No appearance for Respondent.

Kadison, Pfaelzer, Woodard, Quinn & Rossi, Richard T. Williams, John C. Funk, Lawrence A. Cox, Polly Horn, Colin Lennard, City Attorney, Burke, Williams & Sorensen, Cheryl J. Kane and Scott F. Field for Real Parties in Interest.

OPINION

HANSON (Thaxton), J.—San Gabriel Tribune filed petition for writ of mandamus pursuant to Government Code section 6258, providing for injunctive relief to obtain disclosure of a public record. At issue is the propriety of the refusal by the City of West Covina, real party in interest (hereafter respondent City or City), to disclose financial statements to the petitioner, San Gabriel Valley Tribune (Newspaper). Petitioner Newspaper seeks access to financial statements used to evaluate a rate increase that the City granted to real party in interest, West Covina Disposal Company (hereafter respondent or Disposal Company).

FACTUAL AND PROCEDURAL HISTORY

On August 23, 1982, the City of West Covina met publicly to discuss a proposed rate increase under an existing and exclusive contract for waste disposal with the Disposal Company. The City contracted with the Disposal Company in July 1975 to collect garbage and rubbish within the city boundaries. The City and Disposal Company had contracted with one another for this service since 1961. The duration of the contract was from July 1976 to December 31, 1985. The terms expressly provided that "the contractor shall act as an independent contractor in the performance of the within agreement and shall not be subject to the direction of the City as to the manner in which said work is to be performed, other than inspection by the City to insure that the terms hereof are performed by the Contractor."

Additionally, the contract provided that either party could request a complete review of the terms of the agreement at the end of each two-year period. In the event that a proposed revision to the terms of the contract was not reached, either party could terminate the contract with six months notice. The contractor agreed to pay the City five percent of the sums it collected, in addition to any other licenses or taxes charged by the City. The contractor was charged with submitting annually on or before August 31 a certified statement of the contractor's total collections for the preceding fiscal year. A rate schedule was attached and incorporated as part of the contract.[1]

The result of the August 23, 1982, meeting was that the City approved the Disposal Company's proposed rate increase that amounted to about a 15 per-

---

[1]The contract also provided that the contractor was to bill the customers directly. The original rate schedule contained in the contract reads in relevant part as follows:

| | | Monthly Rate |
|---|---|---|
| Single Family Residence | Once weekly pick-up of Rubbish | $2.40 |
| Apts or multiple units containing 4 or more dwlg. units | Twice wkly pick-up of rubbish at central location on premises | $1.45 per dwlg. unit or be billed monthly and the total amt. of mthly billing to be paid by owner |

. . . . . . . . . . . . . . . . . . . . . . . . . .

Commercial and Industrial Establishments

RUBBISH:

| 80 pounds or 2 cubic yards per pick-up | 1 pick-up per week $1.50 wk. | 2 pick-ups per week $3.00 wk. | 3 pick-ups per week $4.50 wk. | 6 pick-ups per week $6.00 wk. |
|---|---|---|---|---|

Commercial Wet Garbage

Boarding house, hotel or place of business

| Wet Garbage | 2 collections per week | 3 collections per week | 6 collections per week |
|---|---|---|---|
| 10 gallons or less | $1.50 | $2.35 | $4.50 |
| 11 gallons to 20 gal. | 1.80 | 2.70 | 5.40 |
| 21 gallons to 30 gal. | 2.10 | 3.15 | 6.30 |
| 31 gallons to 40 gal. | 2.40 | 3.60 | 7.20 |
| 41 gallons to 50 gal. | 2.70 | 4.05 | 8.10 |
| 51 gallons to 60 gal. | 3.00 | 4.50 | 9.00 |

Excess of 60 gallons, the rate of 10¢ for each additional five gallons or fraction thereof per collection.

cent increase for residential customers and a 25 percent increase for commercial customers over a two-year period.[2]

The Newspaper sent a reporter, Karen Zappe, to cover the city council meeting. According to Zappe's declaration, a packet of information containing a two-page memorandum prepared by Leonard Eliot, Assistant City Manager, was given to each council member. The memorandum recommended approval of the rate increase. The information contained in the memorandum was utilized by the council to decide on whether to grant the proposed rate increase. The memorandum referred to financial reports submitted by the Company concerning their current year of operations in support of a rate increase.[3] Zappe requested the financial information following the meeting and again on August 21, 1982. Her requests were denied.

On August 27, 1982, the Newspaper made a written request to the City requesting access to the Disposal Company's 1980 and 1981 financial statements.

---

[2]On the same day as the City's public action, it signed an amendment to the contract effective September 1, 1982, in relevant part as follows:

| | Monthly Rate |
|---|---|
| For a regularly scheduled Single Family Resident once weekly pick-up from street . . . | On and after 9/1/82 $ 4.90 |
| Apartments or multiple units containing 4 or more dwelling units twice weekly pick-up of rubbish at central location on premises . . . | On and after 9/1/82 $ 3.45 |

Commercial and Industrial Establishments

RUBBISH:

| Times per week pick-up: | 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|---|
| | $33.00 | $50.00 | $65.00 | $76.00 | $88.00 | $102.00 |

| 1½ Yard Bin | | | |
|---|---|---|---|
| | $28.00 | $42.00 | $54.00 |

The amendment also provided that the contractor would furnish and service at no cost 30 litter disposal localities at designated sites. The duration of the contract was extended to December 31, 1992.

[3]Petitioners seek access to financial statements for 1980 and 1981, while respondents insist only one statement was given to the City to evaluate the rate increase—for the fiscal year ending March 31, 1982. Petitioners may have based their request on City Manager Herbert Fast's letter of September 3, 1982, in which he refused disclosure of these statements. In its reply brief, petitioner states that it wants access to all financial data relied on by respondent to justify granting the rate increase.

The request was denied by City Manager Herbert Fast in a letter of September 3, 1981. In his letter, Fast said the denial was premised on the City's policy of reviewing rate increases on the basis of "rate of return on investment of the corporation" to determine what would be reasonable. This policy, said Fast, was adopted by the City six years past, due to his dissatisfaction with the former evaluation process of reviewing market rates charged in comparable cities. Fast referred to information that Eliot provided to the reporter—total salaries, total operating costs, significant operating centers, profit after taxes and existing and predicted rate of return. Fast said it was the City's view that the financial information was a private corporation's confidential documents obtained in confidence and therefore unavailable to the public.

On October 5, 1982, petitioner brought a petition in the superior court for an alternative writ of mandate to compel disclosure or, in the alternative, a complaint for declaratory relief. Petitioner premised its petition for disclosure of public records on both the Public Records Act and the Brown Act. The proceedings were delayed until October 28, 1982, to enable respondent Disposal Company to intervene in the action. On December 2, 1982, the matter was heard and the writ was denied. The basis of the lower court's denial was that the statements were exempted from disclosure under Government Code sections 6254, subdivision (k) and 6254, subdivision (n).[4]

On February 28, 1983, this court granted an alternative writ of mandate, directing that respondent superior court either vacate its denial of the writ or show cause why a peremptory writ should not issue ordering the court to so vacate its denial.

We note that the petition for mandate filed in this court was an original proceeding, undertaken on the assumption that petitioner had no adequate remedy at law (Code Civ. Proc., § 1085). ■ An appeal does lie from the denial by the superior court of a writ of mandate (see Code Civ. Proc., § 1110; and 5 Witkin, Cal. Procedure (2d ed. 1971), § 178, p. 3938 and 1983 Supp. at p. 347), and is ordinarily considered an adequate remedy (5 Witkin, *supra,* § 101, p. 3875); however, "the adequacy of another remedy, such as appeal, depends on the circumstances of the particular case, and thus a large measure of discretion to grant or deny the writ rests in the court." (5 Witkin, *supra,* § 92, p. 3867.) In the case at bench, the court's decision to issue the alternative writ was predicated on the need for speedy resolution of issues in which the public, particularly the citizens of the City of West Covina, have a very genuine interest (see 5 Witkin, *supra,* § 106, p. 3880).

---

[4]Statutes hereinafter cited will refer to the Public Records Act (Act), Government Code section 6250 et seq., unless otherwise indicated. The court below rejected respondents' contention that 6254, subdivision (c) exemption applied, which provided for nondisclosure of "personnel, medical, or similar files . . . ."

■ A writ of mandate will lie "to compel the performance of an act which the law specially enjoins, as a duty resulting from an office, trust, or station. . . ." (Code Civ. Proc., § 1085.) Petitioner must not only show that respondent City has a duty to perform but that petitioner has a substantial right to the performance of this duty. (*Payne* v. *Superior Court* (1976) 17 Cal.3d 908, 925 [132 Cal.Rptr. 405, 553 P.2d 565]; 5 Witkin, Cal. Procedure (2d ed. 1971), Extraordinary Writs, § 61, p. 3838.)

■ Mandamus will not be granted to control the proper exercise of discretion unless the court's discretion can be exercised in only one way. (*Hurtado* v. *Superior Court* (1974) 11 Cal.3d 574 [114 Cal.Rptr. 106, 522 P.2d 666]; 5 Witkin, *supra,* § 80, p. 3857.) It is unusual that a court is bound to exercise its discretion in one "right" way. (*Nathanson* v. *Superior Court* (1974) 12 Cal.3d 355, 361 [115 Cal.Rptr. 783, 525 P.2d 687].)

■ When, as here, petitioner acts in the public interest "to procure the enforcement of a public duty" he may not show any legal or special interest in the result. (*Green* v. *Obledo* (1981) 29 Cal.3d 126, 144 [172 Cal.Rptr. 206, 624 P.2d 256]; *Hollman* v. *Warren* (1948) 32 Cal.2d 351, 357 [196 P.2d 562].) Consequently, we review the matter presented on the merits.

## ISSUES

In support of a writ of mandate, petitioner contends: (1) that the financial data in question is a public record within the meaning of section 6250; (2) that the exemption provided under section 6254, subdivision (k) is inapposite because the data is not confidential information protected under either Evidence Code sections 1060 or 1040, both of which are incorporated in this exemption, and that the exemption provided under section 6254, subdivision (n) is also inapposite because this exemption protects applicants for licenses and not contractors of the City; (3) that the balancing test provided under section 6255 weighs in favor of public disclosure as opposed to the Disposal Company's privacy interests; (4) that the City and Disposal Company's pursuit of a rate increase is tantamount to a waiver of any privacy interests that they may have had in the data; and (5) that petitioner is entitled to attorney's fees pursuant to Government Code section 54960.5. We agree with petitioner's position, as our discussion indicates.

## DISCUSSION

### I

A. *Introduction*

■ The California Public Records Act[5] was enacted in 1968 to safeguard the accountability of government to the public, for secrecy is antithetical to a

---

[5]Statutes 1968, chapter 1473, section 39, page 2945.

democratic system of "government of the people, by the people [and] for the people." The Act "was enacted against a 'background of legislative impatience with secrecy in government . . . .' (53 Ops.Cal.Atty.Gen. 136, 143 (1970).) The Legislature had long been attempting to 'formulate a workable means of minimizing secrecy in government.' (*Id.*, at p. 140, fn. omitted.)" (*American Civil Liberties Foundation* v. *Deukmejian* (1982) 32 Cal.3d 440, 457 [186 Cal.Rptr. 235, 651 P.2d 822].) The Act replaced a number of statutes that were cumbersome to apply. This statutory disarray was not cured by the Brown Act of 1953.[6] (See Schaffer et al., *A Look at the California Records Act and Its Exemptions* (1974) 4 Golden Gate L.Rev. 203, 212.)

The legislative imprimatur of the Act is contained in section 6250 declaring that "access to information concerning the conduct of the people's business is a fundamental and necessary right of every person in this state." The concept that access to information is a fundamental right is not foreign to our jurisprudence: "Nearly two hundred years ago, James Madison stated, '[k]nowledge will forever govern ignorance and a people who mean to be their own governors, must arm themselves with the power knowledge gives. A popular government without popular information or the means of acquiring it, is but a prologue to a farce or a tragedy or perhaps both.' " (Schaffer, *supra,* pp. 203, 204 quoting from S. Rep. No. 813, 89th Cong., 1st Sess., p. 1 (1965).)

In the case at bench, "popular information" concerns a very substantial rate increase which will not only net additional revenue for both City and Disposal Company, but the revenue will be obtained at the expense of the public, the consumers in the City who will be subjected to the increased cost of garbage disposal. Viewed in this light, the action of the City and Disposal Company, taken on the basis of information withheld from the citizens who are to pay the bill, would result in what is in essence a "hidden" tax on the city taxpayers, the type of financial maneuvers such popular measures as Proposition 13 attempted to preclude.

■ The Act, modeled after the 1967 federal Freedom of Information Act (FOIA), can draw on its federal counterpart for judicial construction and legislative history. (*American Civil Liberties Union Foundation, supra,* 32 Cal.3d 440, 447, mod. 32 Cal.3d 866a; *Black Panther Party* v. *Kehoe* (1974) 42 Cal.App.3d 645, 652 [117 Cal.Rptr. 106].) This resource becomes a useful tool, in view of the lack of California cases construing the Act. Moreover, the

---

[6]Statutes 1953, chapter 1588, p. 3269. The Brown Act, Government Code sections 54950 et seq. declares that "[t]he public commissions, boards and councils and the other public agencies in this State exist to aid in the conduct of the people's business. It is the intent of the law that their actions be taken openly and that their deliberations be conducted openly." Petitioners also base their right to disclosure on the Brown Act.

Act, like the FOIA, reflects a general policy of disclosure that can only be accomplished by narrow construction of the statutory exemptions. (See *Black Panther Party* v. *Kehoe, supra,* 42 Cal.App.3d 645, 653, fn. 7.)

The basic rule providing access to public records is contained in section 6253.[7] A series of 17 exemptions to this general rule are contained in section 6254.[8] "[T]hese exemptions are designed to protect the privacy of persons whose data or documents come into governmental possession." (*Black Panther Party* v. *Kehoe, supra,* at p. 652.). In footnote 8, we have set forth the three exemptions, subdivisions (c), (k), and (n), which are the subject of contentions and discussion in this opinion; particularly, subdivisions (k) and (n). A waiver of an exemption exists under section 6254.5 "whenever a state or local agency discloses a public record which is otherwise exempt . . . ." Moreover, the burden of showing that nondisclosure is justified is on the agency seeking to withhold the requested record under section 6255.[9] The statutory scheme encourages openness by government by providing that a governmental agency may adopt a policy of greater access to the public than is provided by the Act. (See § 6253.1.)

---

[7]The relevant part reads as follows:

Section 6253. "(a) Public records are open to inspection at all times during the office hours of the state or local agency and every citizen has a right to inspect any public record, except as hereafter provided. Every agency may adopt regulations stating the procedures to be followed when making its records available in accordance with this section."

[8]The relevant part reads as follows:

Section 6254. "Except as provided in Section 6254.7[*], nothing in this chapter shall be construed to require disclosure of records that are any of the following:

" . . . . . . . . . . . . . . . . . . . .

"(c) Personnel, medical, or similar files, the disclosure of which would constitute an unwarranted invasion of personal privacy.

" . . . . . . . . . . . . . . . . . . . .

"(k) Records the disclosure of which is exempted or prohibited pursuant to provisions of federal or state law, including, but not limited to, provisions of the Evidence Code relating to privilege.

" . . . . . . . . . . . . . . . . . . . .

"(n) Statements of personal worth or personal financial data required by a licensing agency and filed by an applicant with such licensing agency to establish his personal qualification for the license, certificate, or permit applied for.

" . . . . . . . . . . . . . . . . . . . .

"Nothing in this section is to be construed as preventing any agency from opening its records concerning the administration of the agency to public inspection, unless disclosure is otherwise prohibited by law."

[9]Section 6255. "The agency shall justify withholding any record by demonstrating that the record in question is exempt under express provisions of this chapter or that on the facts of the particular case the public interest served by not making the record public clearly outweighs the public interest served by disclosure of the record."

---

*6254.7, amended by Statutes 1981, chapter 729, section 2, page 2882, provides inter alia that air pollution data, and notices and orders to building owners are public records.

## B. *Public Records*

A local agency is required under section 6253 to make its public records accessible to the public. The City is a local agency by definition under section 6252, subdivision (b) and therefore has a statutory duty to provide access to public records. Newspaper seeks access to the data in order that it may apprise the public of the propriety of the rate increase. In this way, Newspaper is acting as a guardian for the public. No special right of access has thus far been accorded to the press either federally or in California. (*Sacramento Newspaper Guild* v. *Sacramento County Bd. of Suprs.* (1968) 263 Cal.App.2d 41, 46 [69 Cal.Rptr. 480]; *Pell* v. *Procunier* (1974) 417 U.S. 817 [41 L.Ed.2d 495, 94 S.Ct. 2800].) The press occupies virtually the same position with respect to the City that any citizen would who seeks access to information, elucidating machinations of local government. A fortiori, the newspaper has access to the data if the data is a public record: " 'Any record required by law to be kept by an officer, or which he keeps as necessary or convenient to the discharge of his official duty, is a public record.' [Citations omitted.] On the other hand, the mere fact that a writing is in the custody of a public agency does not make it a public record." (*City Council* v. *Superior Court* (1962) 204 Cal.App.2d 68, 73 [21 Cal.Rptr. 896].) The Attorney General defines a public record more broadly: "Public records, as defined by Government Code section 6252 subdivision (d), 'includes any writing containing information relating to the conduct of the public's business prepared, owned, used, or retained by any state . . . agency regardless of physical form or characteristics.' 'Writing' is further defined by said section 6252 subdivision (e) as: '. . . handwriting, typewriting, printing, photostating, photographing, and every other means of recording upon any form of communication or representation, including letters, words, pictures, sounds, or symbols, or combination thereof, and all papers, maps, magnetic or paper tapes, photographic films and prints, magnetic or punched cards, discs, drums, and other documents.'

" . . . . . . . . . . . . . . . . . . . . . .

" 'This definition is intended to cover every conceivable kind of record that is involved in the governmental process and will pertain to any new form of record-keeping instrument as it is developed. Only purely personal information unrelated to "the conduct of the public's business" could be considered exempt from this definition, i.e., the shopping list phoned from home, the letter to a public officer from a friend which is totally void of reference to governmental activities.' Assembly Committee on Statewide Information Policy California Public Records Act of 1968. 1 Appendix to Journal of Assembly 7, Reg. Sess. (1970), see also 53 Ops. Cal. Atty. Gen. 136, 140-143 (1970)." (58 Ops. Cal. Atty. Gen. 629, 633-634 (1975).)

■ We conclude that the financial data that the City relied on in granting the rate increase constitutes a public record subject to public disclosure. The City has a contractual relationship with the Disposal Company. The City delegated its duty of trash collection to the Disposal Company but still retained the power and duty to monitor the Disposal Company's performance of its delegated duties, under the express terms of the contract. There is no question that the Disposal Company is providing a service to the residents of the City, by way of a contract made between it and the City. Assurances of confidentiality by the City to the Disposal Company that the data would remain private was not sufficient to convert what was a public record into a private record. (*Johnson* v. *Winter* (1982) 127 Cal.App.3d 435, 439 [179 Cal.Rptr. 585].) Unless one of the exemptions applies to bar disclosure then the City must yield to its statutory duty that compels disclosure of the data.

## II

### A. *Section 6254, subdivision (k) Exemption*

■ Subdivision (k) exempts records which are exempted pursuant to federal or state law, including Evidence Code sections 1040 and 1060.[10] In *Cook* v. *Craig* (1976) 55 Cal.App.3d 773 [127 Cal.Rptr. 712], the court rejected the claim that disclosure was exempted, under subdivision (k), of the California Highway Patrol's procedural regulations governing the investigation of citizen complaints. Plaintiffs had sought access to these records in order to evaluate whether to pursue administrative remedies against the California Highway Patrol. The court declared that subdivision (k) is not an independent

---

[10]Evidence Code section 1040 is asserted by the City to shield it from the duty of disclosure, while Evidence Code section 1060 is asserted by the Disposal Company to justify nondisclosure. The statutes read as follows:

Section 1040. "(a) As used in this section, 'official information' means information acquired in confidence by a public employee in the course of his duty and not open, or officially disclosed, to the public prior to the time the claim of privilege is made.

"(b) A public entity has a privilege to refuse to disclose official information, and to prevent another from disclosing such information, if the privilege is claimed by a person authorized by the public entity to do so and:

"(1) Disclosure is forbidden by an act of the Congress of the United States or a statute of this state; or

"(2) Disclosure of the information is against the public interest because there is a necessity for preserving the confidentiality of the information that outweighs the necessity for disclosure in the interest of justice; but no privilege may be claimed under this paragraph if any person authorized to do so has consented that the information be disclosed in the proceeding. In determining whether disclosure of the information is against the public interest, the interest of the public entity as a party in the outcome of the proceeding may not be considered." (Stats. 1965, ch. 299, § 2.)

Section 1060. "Privilege to protect trade secret. 'If he or his agent or employee claims the privilege, the owner of a trade secret has a privilege to refuse to disclose the secret, and to prevent another from disclosing it, if the allowance of the privilege will not tend to conceal fraud or otherwise work injustice.'" (Stats. 1965, ch. 299, § 2, p. 1297.)

exemption because it incorporates other existing legal exemptions and pro-hibitions. Petitioner claims the exemption does not bar disclosure because disclosure is *not* forbidden by an act of Congress or a statute of the state. Conversely, respondent City argues that disclosure is not mandated under the trade section exemption in subdivision (k), where fraud or injustice will not be concealed. Similarly, the court below found there was no showing that the rate increases were "egregious," thus warranting disclosure of the data. The court below also recognized the need for keeping financial information secret to protect private corporations from being forced to disclose trade secrets to competitors.

While we are mindful of the legitimate privacy interests that subdivision (k) was designed to protect, we agree with petitioner that there was no showing below that respondent Disposal Company would be so injured by revealing the data. Moreover, under Evidence Code section 1040, there was no showing that disclosure of the information was against the public interest. Disclosure was shown to weigh in favor of the public's interest in view of the fact that the rate increase amounted to a 15 to 25 percent increase in just two years that the public—not the City—would have to pay. Further, assurances of confidentiality are insufficient in themselves to justify withholding pertinent public informa-tion from the public. (*Johnson* v. *Winter* (1982) 127 Cal.App.3d 435, 439 [179 Cal.Rptr. 585].) Nor is a showing of egregious conduct necessary to gain ac-cess to relevant data, since in many cases knowledge of such could only be gained by access.

Respondent Disposal Company analogizes the instant case to an issue faced by the Attorney General on whether details of proposed health plans were con-fidential and protected from disclosure by the State Department of Health. (See 58 Ops.Cal.Atty.Gen. 371 (1975).) The opinion concluded that the details of the organization, operations, and financial status of the reorganization, with whom the department was negotiating a contract, were exempted under section 6254, subdivision (k), as well as under the balancing test in section 6255. The opinion based its finding on: (1) the commercial nature of the information that would be vulnerable to appropriation by a competitor; and (2) the chilling effect revealing details of proposed health plans could have on the future development of such plans. However, the opinion confirmed that subdivision (k) was *condi-tional and not absolute*: "[T]he very fact that a balancing process is con-templated requires that the privilege be considered conditional rather than ab-solute. As was stated by the court in *People* v. *Superior Court,* 19 Cal.App.3d 522 (1971), 'Evidence Code section 1040 establishes a governmental privilege barring evidence of official information whose disclosure is against the public interest. The privilege is conditional in the sense that the court must weigh the necessity for preserving the confidentiality of the information against the necessity for disclosure in the interest of justice.'" (*Id.,* at p. 375.)

The disclosure of confidential information regarding proposed prepaid health plans is distinguishable from the facts at hand, where the City was enlisting financial data from a company with whom it had a contractual relationship for more than 20 years. No proposed contract was before the City, only revisions to the contract were submitted to the City concerning a substantial rate increase that the city residents would absorb, and from which the City stood to profit, as well as a longterm extension to 1991.

Further, the privilege that section 6254, subdivision (k) incorporates should be applied conditionally on a clear showing that disclosure is against the public's interest. No such showing is evident under the facts of this case. Respondent City argues that disclosure will both invade a private company's privacy interests, as well as having a chilling effect on obtaining information in similar future transactions. It is said that such a threat to future dealings constitutes a sufficient reason to withhold disclosure in the name of the public's interest. This argument, however, misstates what the public's interest is as serving the privacy interests of a private contractor, rather than in serving the public's interest in participating in local government. For these reasons, the withholding of information cannot be justified under section 6254, subdivision (k).

■ Respondent City likens 5 United States Code, section 552(b)4 of the FOIA, exempting "trade secrets and commercial or financial information obtained from a person and privileged or confidential," to section 6254, subdivision (c) of the Act. The court below did not find subdivision (c) exempted the City from disclosure. The purpose of the exemption is to "protect information of a highly personal nature which is on file with a public agency . . . [to] typically apply to public employee's personnel folders or sensitive personal information which individuals must submit to government." (Final Rep. of Cal. Statewide Information Policy Com. (Mar., 1970), pp. 9-10, 1 Appen. to Assem. J. (1970 Reg. Sess.).) According to Professor Davis, the most important decision concerning this exemption is *American Mail Line, Ltd.* v. *Gulick* (D.C.Cir. 1969) 411 F.2d 696, 703 [7 A.L.R.Fed. 840], "holding that a memorandum which would qualify for the exemption lost its exempt status when the agency stated that the basis for its order requiring a payment of money was stated in the memorandum." (Davis, Administrative Law Treatise (1970 Supp.) § 3A.21, pp. 155-156.) Since the Act was modeled after the FOIA and California courts have utilized federal law to construe the Act, this precedent applies to the instant case. (See *Uribe* v. *Howie* (1971) 19 Cal.App.3d 194, 212-213 [96 Cal.Rptr. 493], where the court followed federal law in construing section 6254, subdivision (f).) In *American Mail Line,* nine shipowners who had been receiving government subsidies sought access to a memorandum which formed the basis of a ruling issued by the Maritime Subsidy Board of the Department of Commerce. The board decided that crews of 50 men were fair and reasonable, although the cost of eight addi-

tional crew members was unreasonable. Access to the full memorandum, part of which was attached to the finding, was sought to make a meaningful petition for reconsideration of the decision that required a refund of $3.3 million in past subsidy payments. The court held that the memorandum was not properly exempted from disclosure because "the Board by stating in unqualified terms that its action was based upon a certain specified memorandum, thereby incorporated that memorandum into its administrative decision . . . ." (*Id.*, at p. 702.) The court noted that the burden was on the government to show that the memorandum was not incorporated in its action and if the "Board did not want to expose its staff's memorandum to public scrutiny it should not have stated publicly . . . that its action was based upon that memorandum, giving no other reasons or basis for its action." (*Id.*, at p. 703.)

Similarly, in the case at bench, the City publicly based its decision on financial data supplied to it by the Disposal Company. It cannot now be heard to call for concealment after it voluntarily injected the data into the decision-making process of government. This was precisely the type of governmental action that the Brown Act and the Public Disclosure Act were designed to keep open to public scrutiny.

*National Parks and Conservation Ass'n.* v. *Kleppe* (D.C. 1976) 547 F.2d 673, was written by Justice Tamm, the same author of *American Mail Line*. It is relevant here because it discussed the need for compelling *proof* of economic damage brought by disclosure and declared that exemptions to the FOIA were subject to narrow construction. The question in *Kleppe* concerned whether 5 United States Code, section 552(b)4 (1970), providing for the exemption from disclosure of "trade secrets and commercial or financial information obtained from a person and privileged or confidential . . .," exempted governmental defendants from withholding financial records filed by national park concessionaires. The plaintiff, the National Parks and Conservation Association, sought to analyze the effectiveness of the services' concessions by reviewing records that included financial data. The court held that the evidence was sufficient to support the conclusion that disclosure would probably cause substantial harm to the five concessionaires' competitive positions. In so holding, the court referred to its general policy of narrowly construing the exemptions to give effect to FOIA's intent to insure comprehensive public access to government records. In balancing the interests of the public in disclosure and the concessionaires' interest in privacy, the court acknowledged that disclosure was sought of "very detailed and extensive financial information . . . ." (*Id.*, at p. 687.) It should be noted that the court remanded the case to determine if the exemption in section 552(b)4 prevented disclosure on privacy grounds as to two of the concessioners. We adhere to the federal court's policy of narrowly construing the disclosure exemptions and agree with the court below that section 6254, subdivision (c) does not apply.

## B. *Section 6254, subdivision (n) Exemption*

6254, subdivision (n) exempts "[s]tatements of personal worth or financial data required by a licensing agency and filed by an applicant with such licensing agency to establish his personal qualifications for the license, certificate, or permit applied for." This exemption is similar to the FOIA exemption in section 522(b)4, though the FOIA is said to be broader because it is not limited to licensing. (See *Schaffer et al., supra,* pp. 231-232.) Section 6254, subdivision (n) was added by amendment in 1970[11] in conjunction with the rewriting of 6254, subdivision (d) aimed at exempting regulatory agencies of financial institutions from disclosing financial records. (*Ibid.*)

■ A license is not a contract, according to *Rosenblatt* v. *Cal. St. Bd. of Pharmacy* (1945) 69 Cal.App.2d 69, 74 [158 P.2d 199] which stated that, "A license has none of the elements of a contract and does not confer an absolute right but a personal privilege . . . ." (*Ibid.*) There is a clear distinction between a license and a contract, although respondent City correctly states the frequent misuse of words such as "license," "permit," and "franchise." Nevertheless, a license, defined "as a permission or privilege to do what otherwise would be unlawful . . .," is most typically ". . . employed to designate official municipal authorization of a continuing business or activity . . . ." (9 McQuillan, Municipal Corporations (3d ed.) § 26.01a, pp. 6-7.) In the past, since franchises have been defined to include privileges, they have been compared to licenses. However, franchises "are coming to be regarded . . . as functions delegated to private individuals to be performed for the furtherance of the public welfare and subject to public control." (See 12 McQuillan, Municipal Corporations (1970) § 34.01, p. 7.) Under this usage, franchise is closely akin to a contractual relationship which creates a right-duty relationship.[12]

■ The term license within the meaning of section 6254, subdivision (n) must be construed narrowly in order to give effect to the legislative intent that favors disclosure over secrecy in government. If the Legislature had intended a broad exemption to apply to *any* financial statements then it need not have hinged the exemption to those filing applications with licensing agencies. It makes good sense to exempt such applicants whose business with the agency is only public to the extent that they must comply with the licensing requirements and regulations. That situation is distinct from the type of contractual relation-

---

[11]Statutes 1970, chapter 1231, section 11.5, page 2157.

[12]Black's Law Dictionary (5th ed. 1979) at pages 291-292 defines contract as: "An agreement between two or more persons which creates an obligation to do or not to do a particular thing." A license is defined as, "The permission by competent authority to do an act which, without such permission, would. be illegal, a trespass or a tort." Franchise is defined as, "A special privilege conferred by government on individual or corporation, and which does not belong to citizens of country generally of common right."

ship that exists between the City and the Disposal Company. The latter is not just applying to the City for a license or permit to operate, but is assuming a City function that continues to be monitored and reviewed at regular two-year intervals. The exemption under section 6254, subdivision (n) was not designed to unconditionally protect such a symbiotic relationship.

## III

### *Section 6255—Burden of Proof and Balancing Test*

■ Section 6255 places the burden on the agency to justify withholding the record on the basis of an express exemption or on a showing that public interest served in nondisclosure outweighs the public interest in disclosure. The section serves as a residuary statutory exemption for balancing privacy interests with the public's interest in access. (*Black Panther Party* v. *Kehoe* (1974) 42 Cal.App.3d 645, 657 [117 Cal.Rptr. 106].) In *Uribe* v. *Howie* (1971) 19 Cal.App.3d 194 [96 Cal.Rptr. 493], the court held the public interest in disclosure of pesticide spray reports exceeded the governmental interest in confidentiality. The balancing of the public's right to access against the government's need to protect privacy was recently recognized in *American Civil Liberties Union Foundation* v. *Deukmejian* (1982) 32 Cal.3d 440 [186 Cal. Rptr. 235, 651 P.2d 822], where the court held written complaints against collection agencies were exempt from disclosure under section 6254, subdivision (f). However, the court also held that section 6255 did not authorize selective disclosure to collection agencies: "Neither [section 6254 or section 6255] permits the public custodian to balance 'the interest of one private party against the interest of another.'" (*Id.*, at p. 658.) The court not only acknowledged reliance on the FOIA for judicial construction and legislative history, but expressly declined to construe section 6254, subdivision (f) broadly. (*Id.*, at pp. 447, 449.)

We are mindful that respondents may have legitimate privacy interests to protect, yet, the interests on the part of the City in not chilling future information-gathering abilities in business transactions, and on the part of the Disposal Company in jeopardizing competitive advantages, does not outweigh the public's need to be informed of the provision of governmental services contracted on behalf of the residents.

## IV

### *Waiver of Privacy Interest*

■ Petitioners argue that respondent Disposal Company waived any privacy interests it may have had by voluntarily injecting itself into the public

arena by seeking a rate increase and submitting financial data in support of same. Petitioners rely on *Kapellas* v. *Kofman* (1969) 1 Cal.3d 20, 36 [81 Cal.Rptr. 360, 459 P.2d 912], for the proposition that voluntary entry into the public sphere diminishes one's privacy interests. We agree. Moreover, as in *American Mail Line, Ltd.* v. *Gulick* (D.C. Cir. 1969) 411 F.2d 696, 703 [7 A.L.R.Fed. 840], respondent City publicly based its decision to grant the rate increase on financial data voluntarily submitted by the Disposal Company. Any privacy interest that may have existed in this data was converted once it was used not only to support but to justify the rate increase.

## V

*Attorney Fees*

■ Petitioner seeks attorney fees pursuant to Government Code section 54960.5, which provides for the award for costs and reasonable attorney fees pursuant to section 54960, when a violation under the Brown Act has been found. In addition, costs and reasonable attorney fees may be awarded pursuant to section 6259[13] of the Act, where a violation by an agency has been found. Because we find the City has violated the Act requiring it to disclose the financial data, we conclude that petitioner is entitled to the costs and reasonable attorney fees incurred in bringing the writ of mandate below, as well as in petitioning this court for review.

## Conclusion

Under the particular situation presented here the real party in interest City had a clear duty to disclose the financial data sought by petitioner, data which constituted a public record pursuant to section 6250 et seq. of the Government Code, and data utilized by the City to grant the rate increase to real party in interest Disposal Company. None of the exemptions contained in Government Code section 6254 applied to the information sought.

## Disposition

Let a peremptory writ of mandate issue, directing respondent Superior Court to vacate its denial of petitioner's petition for a writ of mandate and to grant petitioner's petition. Since Government Code section 6259 mandates an award of costs and fees to a prevailing plaintiff in litigation pursuant to the Public Records Act (§ 6250 et seq.), the respondent court is further directed to award

---

[13]That section provides, in pertinent part, that "The court *shall* award court costs and reasonable attorney fees to the plaintiff should the plaintiff prevail in litigation filed pursuant to this section." (Italics added.)

to petitioner costs and reasonable attorney fees in pursuing relief in both the respondent court and this court.

Lillie, Acting P. J., and Dalsimer, J., concurred.

A petition for a rehearing was denied June 30, 1983, and the petition of real party in interest West Covina Disposal Company for a hearing by the Supreme Court was denied August 17, 1983.