[No. B149322. Second Dist., Div. One. June 13, 2002.]

VEISNA KONG, Plaintiff and Appellant, v.
CITY OF HAWAIIAN GARDENS REDEVELOPMENT AGENCY,
Defendant and Respondent.

**COUNSEL**

Anthony P. Parrille & Associates and Anthony P. Parrille for Plaintiff and Appellant.

Woodruff, Spradlin & Smart, M. Lois Bobak and Roberta A. Kraus for Defendant and Respondent.

**OPINION**

**SPENCER, P. J.—**

### INTRODUCTION

Petitioner Veisna Kong, doing business as Bartha's Donuts, appeals from the order denying his petition for writ of mandate to compel the City of Hawaiian Gardens Redevelopment Agency to pay him relocation benefits. We reverse.

### STATEMENT OF FACTS

In February 1993, by way of assignment, petitioner became the sublessee of a piece of commercial property commonly known as 11913½ Carson Street in the City of Hawaiian Gardens (the premises). Frank and Dorothy Bartha (the Barthas) were the master lessees. Petitioner owned and operated a donut shop on the premises.

The term of the sublease was five years, commencing on January 1, 1992, and ending on December 31, 1996. The sublease contained a provision giving petitioner an option to extend the lease for one 2-year period until

December 31, 1998. The lease further provided that "[i]f the Tenant, with the Landlord's consent, remains in possession of the Premises after the expiration or termination of the term of this Lease, such possession by Tenant shall be deemed to be a tenancy from month-to-month at a rental in the amount of the last monthly rental plus all other charges payable hereunder, upon all the provisions of this Lease applicable to month-to-month tenancy."

On July 22, 1993, respondent City of Hawaiian Gardens Redevelopment Agency (Agency) notified petitioner that he was eligible for relocation advisory assistance and might be eligible for relocation benefits as well. The Agency further apprised petitioner that he was a tenant in a redevelopment project area and it would be necessary for him to move at a later date in order for the Agency to carry out its redevelopment plan. Petitioner would not be required to move without 90 days' advance written notice, however.

In August 1993, the Agency acquired the premises with public funds and for a public purpose. In a letter dated August 31, 1993, the Agency apprised petitioner that effective August 12, 1993, it had acquired the premises formerly owned by the Veady Family Trust. The Agency also told petitioner that his lease had been transferred to the Agency and that, until further notice, all provisions would remain the same. In addition, a new lease would follow within 10 working days. All payments and maintenance requests were to be sent to the Agency.

In a letter dated January 20, 1994, and addressed to petitioner, Attorney Graham A. Ritchie stated: "I represent the . . . Agency which has acquired the property on which Bartha's Donuts is located. In order to make an appropriate offer to you with respect to the relocation of that business it is necessary to complete an analysis of the goodwill of the business and any damage to that goodwill resulting from the proposed relocation." Attorney Ritchie requested that petitioner contact a specific individual and make arrangements to provide that person with the information necessary to properly value the goodwill of his business.

In a notice to vacate dated March 25, 1994, the Agency informed petitioner that he had 90 days to "quit, vacate, and deliver up . . . possession of the premises." On May 5, 1994, pursuant to a disposition and development agreement, the Agency sold the property to a private developer named Dr. Irving Moskowitz. In a certified letter dated May 18, 1994, Beryl Weiner, counsel for Dr. Moskowitz, advised petitioner about the transfer of title.

In her correspondence, Attorney Weiner referenced the Agency's notice to vacate and stated that the 90-day period ended on June 23, 1994. Counsel

further stated, "You were previously informed that Dr. Moskowitz is willing to permit you to remain in possession for a longer period of time, subject to your vacating the premises on a 6-month notice. However, until an agreement in writing is signed between Dr. Moskowitz and you, you will be required to vacate the premises by June 23, 1994."

On June 8, 1994, another one of Dr. Moskowitz's attorneys, William E. Weinberger, wrote to petitioner regarding a request he had made to continue renting the premises. In accordance with a May 26, 1994 telephone conversation, Attorney Weinberger "enclose[d] a lease and rider which provides for a tenancy in your current location at the same rental rate you previously paid." Counsel also informed petitioner that the lease was "terminable by the landlord upon six months' written notice" and he would be required to vacate the premises if an executed lease was not received prior to June 23, 1994. Attorney Weinberger sent petitioner another letter on June 10, along with a revised rider, changing paragraph one "to provide that, unless the landlord exercises its right to terminate the lease on six month's [*sic*] notice, the lease will automatically renew for additional terms." Counsel reminded petitioner that the lease and rider had to be signed and returned by June 23 if he wanted to remain on the premises.

Also on June 10, 1994, the Agency's relocation agent, Kalian & Associates, sent Frank Bartha a letter confirming a June 6 conversation. A copy of the letter was sent to petitioner. The relocation agent apprised Mr. Bartha that a letter regarding a change in ownership of the premises had been sent to petitioner in error by Dr. Moskowitz's attorney. The letter should have been sent to Mr. Bartha instead, in that he was the master lessee. With respect to relocation benefits, the relocation agent stated that "[a]s far as relocation benefits are concerned, I stated to you that in that letter an offer of extension of tenancy was made to Mr. Kong. I suggested that you should meet with Mr. Kong and find our [*sic*] if he is planning to pursue this offer of extension. You would be involved in this process since you are the master lessee. If you and Mr. Kong agree with the new owner on the extension terms, you will continue to pay rent and Mr. Kong can continue in business at that location. At the conclusion of the extension term, *Mr. Kong will be eligible for relocation benefits*. At that time the remaining term of your lease will be evaluated and a determination will be made if it has any value." (Italics added.)

The relocation agent also informed Frank Bartha that, since their conversation, he had met with petitioner, who was "very interested in applying for the extension past June 23, 1994." Petitioner told the relocation agent that he

had contacted Mr. Bartha and the new owner in order to make arrangements for an extension agreement.

On June 21, 1994, Frank Bartha, as tenant, executed a new lease with Dr. Moskowitz, as landlord. Dr. Moskowitz signed the lease on June 26. The lease was for a term of one year and was subject to termination upon six months' notice. As a result, petitioner remained on the premises, conducting business as the Barthas' sublessee.

On February 19, 1999, Kalian & Associates sent petitioner a number of referrals for possible replacement sites. In a letter dated February 25, 1999, Dr. Moskowitz gave petitioner and Frank Bartha notice that the current term of his lease with Mr. Bartha would end on April 30, 1999, and that he would not renew the lease for another term. In a responsive letter dated March 29, 1999, petitioner advised Dr. Moskowitz that his notice of nonrenewal was insufficient to terminate the lease, in that he had failed to give him the required six months' notice. In petitioner's view, the lease consequently had renewed automatically for another one-year term.

Thereafter, in a letter dated April 6, 1999, Dr. Moskowitz informed Frank Bartha and petitioner that he was giving notice that he was terminating the lease agreement that he executed in June 1994 with Mr. Bartha "as of six months from the date of this notice." The Bartha/Moskowitz lease therefore was slated to end on October 6, 1999.

On April 28, 1999, petitioner wrote to Dr. Moskowitz, telling him that his April 6 letter and notice of termination was unacceptable. Among other things, petitioner claimed that Dr. Moskowitz was required to give six months' notice before the current term of the lease ended.

On October 8, 1999, Attorney Weinberger informed Frank Bartha in writing that "the six-month notice period for termination of the Lease that was signed between [Mr. Bartha] and Irving Moskowitz, M.D. has expired. Demand is hereby made that the . . . premises be vacated immediately. In particular demand is hereby made that you have your subtenant, Veisna Kong, vacate the premises so that possession thereof may be delivered immediately to Dr. Moskowitz." Attorney Weinberger further advised that unlawful detainer proceedings would be instituted if the premises were not vacated immediately. When petitioner failed to leave the premises, Dr. Moskowitz filed an action for unlawful detainer against the Barthas and petitioner. Dr. Moskowitz prevailed and a writ of possession of real property was issued. On December 21, 1999, petitioner was evicted from the premises. He has since relocated his donut business.

On July 26, 2000, petitioner filed a claim with the Agency for relocation benefits in the amount of $72,713.05. On August 29, 2000, petitioner forwarded a second letter to the Agency, requesting a meeting with the Agency's appeal board. Petitioner also had several telephone conversations with the Agency's agents or employees regarding his claim for relocation benefits.

## PROCEDURAL BACKGROUND

On September 26, 2000, petitioner filed a verified petition for writ of mandate, along with supporting memorandum of points and authorities. Although petitioner cited Code of Civil Procedure section 1094.5, thereby characterizing his writ as one for administrative mandate, the trial court treated his petition as one for traditional mandate under Code of Civil Procedure section 1085.[1] Petitioner asked that a writ be issued, directing the City to pay him the costs he incurred in relocating his donut shop. Petitioner also filed a request, asking the trial court to take judicial notice of three Los Angeles Superior Court cases involving other tenants on the Veady property that were forced to vacate in 1995 due to the Agency's acquisition of the property.

In December 2000, the Agency filed its answer to the petition for writ of mandate. In January 2001, the Agency filed its opposition to the writ petition, as well as a request that the trial court take judicial notice of the first amended complaint for inverse condemnation and precondemnation damages filed by petitioner in *Kong v. City of Hawaiian Gardens Redevelopment Agency* (Super. Ct., L. A. County, 2000, No. BC226103).[2] Finally, the Agency filed an objection to Kong's request for judicial notice.

Thereafter, petitioner filed what he entitled "Administrative Record." On January 11, 2001, in response to the Agency's opposition, petitioner filed a reply and supplemental brief in support of his writ petition and a separate declaration of his attorney, Anthony P. Parrille, which included as one of the exhibits excerpts from the deposition of Leonard Chaidez. This deposition testimony was taken in *Moskowitz v. Bi-Rite Meat and Provisions Co.* (Super. Ct., L. A. County, 1999, No. VC023098), an unrelated action.

The Agency objected to petitioner's purported "Administrative Record" on the ground that it was untimely and no foundation had been laid for any

[1] We do the same.

[2] The propriety of the order of dismissal entered in petitioner's inverse condemnation case is presently before this court in *Kong v. City of Hawaiian Gardens Redevelopment Agency*, B146142.

of the exhibits contained therein. It also argued that review by way of administrative mandate (Code Civ. Proc., § 1094.5) was inappropriate. The proper avenue was traditional mandate pursuant to Code of Civil Procedure section 1085. In addition, the Agency objected to Attorney Parrille's declaration and the deposition excerpts of Leonard Chaidez on the ground that they were untimely. With regard to the exhibits, the Agency further argued that they were irrelevant and that no foundation had been laid.

At the hearing on petitioner's writ petition, the trial court observed that petitioner's "Administrative Record" was not a proper administrative record. The court noted, as it had observed in its tentative decision, most of the documents in the "Administrative Record" could be made admissible with a declaration from petitioner. The trial court did not want to "waste everyone's time and efforts." It noted, however, that if the Agency insisted on strict compliance, it would sustain its objections and continue the matter to give petitioner time to lay an appropriate foundation. In light of the trial court's indication that it was prepared to make a ruling on the merits, the Agency subsequently withdrew its objections to the "Administrative Record."

The trial court denied petitioner's request for judicial notice, concluding that the other cases were irrelevant. The court granted the Agency's request for judicial notice regarding petitioner's inverse condemnation case "and admitted the evidence by reference" as well as "exhibits to the various pleadings filed."[3] Lastly, the trial court sustained the Agency's objections to Attorney Parrille's declaration and Leonard Chaidez's deposition testimony.

On January 19, 2001, the trial court denied petitioner's request for writ relief. It further ordered that its tentative decision be filed and deemed its statement of decision. The court found that "Petitioner Kong received notification of his possible eligibility for relocation benefits on July 22, 1993, and a 90-day notice to vacate on March 25, 1994. Prior to having to vacate, however, the property was sold to Dr. Irving Moskowitz. [¶] Kong, as per his sublease with sublessors Frank and Dorothy Bartha, continued to occupy the property and to operate Bartha's Donuts for the duration of his sublease. Indeed, it was not until December 1999—1 year after Kong's sublease with the Barthas had expired, and at least 2 months after the Barthas' lease with Moskowitz had expired—that Kong vacated the property. [¶] Kong has thus failed to establish that he vacated the property as a direct result of Respondent Agency's acquisition of the property over 6 years earlier. That Frank

---

[3]Among the exhibits attached to the first amended complaint were copies of photographs depicting Bartha's Donuts prior to its demolition, as well as pictures of the casino parking lot built by Dr. Moskowitz, in part, where Bartha's Donuts once stood.

Bartha (CC to Petitioner) was advised in a letter of June 10, 1993 . . . that Kong might want to pursue an extension of the term during which he could still be eligible for relocation benefits does not mean that Kong is entitled to benefits now, over 6 years later, for being 'forced to vacate' at the expiration of his sublease. Indeed, the letter in question contemplates circumstances in which, at the very least, Kong vacated before the expiration of Bartha's lease." The court therefore concluded that petitioner "failed to establish that he is a 'displaced person' within the meaning of Govt. Code §§ 7260, et seq., or that Respondent Agency has a clear, present, ministerial duty to pay him relocation benefits."

On February 6, 2001, in its amended judgment denying petition for writ of mandate, the trial court denied the petition "for the reasons set for[th] in the Court's written statement of decision incorporated herein by reference." In addition, judgment was entered in favor of the Agency.

CONTENTION

Petitioner contends he was a "displaced person" entitled to relocation benefits. We agree.

DISCUSSION

The resolution of this appeal is not governed by the substantial evidence standard of review as the Agency maintains. Rather, the trial court's findings are subject to our independent review, in that the decisive facts are undisputed. (*Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 799 [35 Cal.Rptr.2d 418, 883 P.2d 960].) ▮ Stated otherwise, because this case requires the application of law to undisputed facts, we review the trial court's decision de novo. (See *Harustak v. Wilkins* (2000) 84 Cal.App.4th 208, 212 [100 Cal.Rptr.2d 718]; *Transdyn/Cresci JV v. City and County of San Francisco* (1999) 72 Cal.App.4th 746, 752 [85 Cal.Rptr.2d 512]; *Metric Man, Inc. v. Unemployment Ins. Appeals Bd.* (1997) 59 Cal.App.4th 1041, 1050 [69 Cal.Rptr.2d 569].) Moreover, we review the trial court's result, not its reasons. (*Economic Empowerment Foundation v. Quackenbush* (1997) 57 Cal.App.4th 677, 692, fn. 13 [67 Cal.Rptr.2d 323].)

▮ Code of Civil Procedure section 1085 permits the issuance of a writ of mandate "to compel the performance of an act which the law specially enjoins." (*Id.*, subd. (a).) The writ will lie where the petitioner has no plain, speedy and adequate alternative remedy, the respondent has a clear, present and usually ministerial duty to perform, and the petitioner has a clear, present and beneficial right to performance. (*Payne v. Superior Court* (1976)

17 Cal.3d 908, 925 [132 Cal.Rptr. 405, 553 P.2d 565]; *Barnes v. Wong* (1995) 33 Cal.App.4th 390, 394 [39 Cal.Rptr.2d 417]; *San Gabriel Tribune v. Superior Court* (1983) 143 Cal.App.3d 762, 771 [192 Cal.Rptr. 415].) Mandate is not available to compel the exercise of discretion on the part of a public official, but it is available to correct an abuse of discretion. (*Barnes*, *supra*, at p. 395.)

█ The California Relocation Assistance Law (CRAL) provides state relocation benefits to persons displaced by state or local acquisitions. (Gov. Code, § 7260 et seq.; *Peter Kiewit Sons' Co. v. Richmond Redevelopment Agency* (1986) 178 Cal.App.3d 435, 444 [223 Cal.Rptr. 728].)[4] The benefits payments are intended to compensate a displaced person for, among other things, "[a]ctual and reasonable expenses in moving himself or herself, his or her family, business, or farm operation, or his or her, or his or her family's, personal property." (Gov. Code, § 7262, subd. (a)(1); *Peter Kiewit Sons' Co.*, *supra*, at p. 444.) "The crucial issue in determining eligibility for benefits is whether there is a 'causal connection between the acquisition [by the public entity] and the displacement which brings into play the provisions' of CRAL. [Citation.]" (*Peter Kiewit Sons' Co.*, *supra*, at p. 444.) "[T]he operative date for eligibility under CRAL is the moving date of the displaced person." (*Superior Strut & Hanger Co. v. Port of Oakland*, *supra*, 72 Cal.App.3d at p. 999.) ·

The "actual exercise of the power of eminent domain is not a prerequisite to relocation benefits." (*Superior Strut & Hanger Co. v. Port of Oakland*, *supra*, 72 Cal.App.3d at p. 994.) All that is required is that the property be acquired for a public purpose. (*Ibid.*) Here, the Agency admitted that it purchased the property for a public purpose with public monies. The CRAL therefore is applicable if petitioner qualifies as a displaced person. We hold that he does.

A "displaced person" is "[a]ny person who moves from real property, or who moves his or her personal property from real property" directly in response to "a written notice of intent to acquire, or the acquisition of, the real property, in whole or in part, for a program or project undertaken by a public entity or by any person having an agreement with, or acting on behalf of, a public entity." (Gov. Code, § 7260, subd. (c)(1)(A)(i).) Subdivision (f) of section 6008 of title 25 of the California Code of Regulations defines "[d]isplaced [p]erson" as "[a]ny person who moves from real property, or who moves his personal property from real property, either:

---

[4]The Eminent Domain Law (Code Civ. Proc., § 1230.010 et seq.) "is clearly separate in purposes and policies" from the CRAL (Gov. Code, § 7260 et seq.). (*Superior Strut & Hanger Co. v. Port of Oakland* (1977) 72 Cal.App.3d 987, 993 [140 Cal.Rptr. 515].)

"(1) As a result of a written notice of intent to acquire by a public entity or as a result of the acquisition of such real property, in whole or in part, by a public entity or by any person having an agreement with or acting on behalf of a public entity, or as the result of a written order from a public entity to vacate the real property, for public use; or

"(2) As a result of the rehabilitation, demolition or other displacing activity undertaken by a public entity or by any person having an agreement with or acting on behalf of a public entity of real property on which the person is in lawful occupancy or conducts a business, and the displacement, except as provided in Government Code section 7262.5, lasts longer than 90 days.

"This definition shall be construed so that persons displaced as a result of public action receive relocation benefits in cases where they are displaced as a result of an owner participation agreement or an acquisition carried out by a private person for or in connection with a public use where the public entity is otherwise empowered to acquire the property to carry out the public use."

■   The Agency contends that petitioner does not qualify as a displaced person, in that he was not required to vacate the leased premises until after the expiration date of his sublease with the Barthas. This argument presupposes incorrectly that petitioner's preacquisition sublease with the Barthas was not terminated by the acquisition. The Agency is mistaken.

In its answer to the petition, the Agency admitted that it acquired the premises "with public funds for a public purpose." Although the Agency denied that its "acquisition was made under threat of condemnation," the uncontroverted evidence contained in the "Administrative Record" undeniably establishes the contrary.

In the month prior to the Agency's acquisition of the property, specifically on July 22, 1993, the Agency sent petitioner a notice informing him that he was a "tenant occupant" in a redevelopment project area and that he had to move in order for the Agency to carry out the project. The Agency further advised petitioner that he was eligible for relocation advisory assistance and might be eligible for relocation benefits. In addition, the Agency apprised petitioner that he would not be required to move "without at least 90 days advance written notice of the date by which [he] must vacate." He was to anticipate receiving such a notice at a later date, which notice "[would] represent [his] formal notice of the vacate schedule and confirm [his] eligibility for reimbursable relocation expenses."

On March 25, 1994, after the Agency acquired the premises for a public purpose from the Veady Family Trust, it notified petitioner that he had 90 days to vacate the premises. Before the 90-day period expired, however, the Agency sold the premises to private developer Dr. Moskowitz under a disposition and development agreement. The premises were part of a larger parcel of property acquired by Dr. Moskowitz to develop a casino.

Inasmuch as Dr. Moskowitz, at that time, was not ready to develop the premises, he was willing to allow Frank Bartha to continue to pay rent and petitioner to remain in business on the premises subject to his vacating of the premises on six months' notice. The Agency's relocation agent, Kalian & Associates, advised Frank Bartha that if he and petitioner reached an agreement with Dr. Moskowitz regarding "extension terms," he could continue to pay rent as the master lessee and petitioner could continue to conduct business on the premises. The relocation agent then represented that at the end of the extension term, *"Mr. Kong will be eligible for relocation benefits."* (Italics added.) The relocation agent further stated that at the same time, "the remaining term of your [meaning Frank Bartha] lease will be evaluated and a determination will be made if it has any value." A copy of the relocation agent's letter to Frank Bartha was sent to petitioner. Petitioner was required to vacate the premises by June 23, 1994, in accordance with the Agency's 90-day notice to quit, however, unless a new lease agreement was executed.

Had this been a simple purchase by the Agency, the Barthas' master lease with the landowner and petitioner's sublease would have continued uninterrupted. (See generally *Kirk Corp. v. First American Title Co.* (1990) 220 Cal.App.3d 785, 809 [270 Cal.Rptr. 24]; *Rosenkranz v. Pellin* (1950) 99 Cal.App.2d 650, 652-653 [222 P.2d 249]; Friedman et al., Cal. Practice Guide: Landlord-Tenant (The Rutter Group 2001) ¶ 2:515, p. 2B-156.) Petitioner was able to continue operating his donut shop after Dr. Moskowitz acquired the property from the Agency only because Frank Bartha entered into a new lease agreement with Dr. Moskowitz, however. Thus, the only reasonable construction of the evidence is that the original master lease between the Barthas and the Veady Family Trust was terminated as a result of the Agency's taking of the property (see Code Civ. Proc., § 1265.110) and replaced with the Bartha/Moskowitz lease. As for the original sublease agreement between petitioner and the Barthas, that agreement terminated according to its own terms as a result of the taking.[5] That petitioner ultimately was not required to vacate the premises until after what would

---

[5]The condemnation provision in the original sublease provided that "[i]f the Premises or any portion thereof are taken by the power of eminent domain, or sold by Landlord under the threat of exercise of said power (all of which is herein referred to as 'condemnation'), this

have been the last day of his original sublease with the Barthas (December 31, 1998) does not compel a contrary conclusion. Had Dr. Moskowitz needed the premises earlier, he could have terminated his lease with Frank Bartha well before that date.

As a subtenant on the premises, petitioner's postacquisition ability to operate his donut shop on those premises was dependent wholly on the existence of the lease between Frank Bartha and Dr. Moskowitz. Whatever contractual entitlement petitioner originally had with the Barthas to remain on the premises to December 31, 1998, no longer existed, since the Barthas themselves did not have a contractual leasehold interest in the property to that date specific. Under the new one-year contractual arrangement, Frank Bartha was permitted to pay rent (as the tenant) and petitioner was permitted to conduct his business (as the subtenant) subject to termination on six months' notice. In the event there was no termination, the agreement automatically renewed for one-year terms. This arrangement enabled Dr. Moskowitz to continue receiving income from his property until such time as he needed the premises for his development and then to rid himself of his tenant with only six months' notice when that need arose.

If petitioner had elected to relocate his business in 1994 when Dr. Moskowitz acquired the property from the Agency, there is no question that petitioner would have been entitled to relocation benefits. We see no reason he should have to forego such benefits simply because a mutually beneficial agreement between Frank Bartha and Dr. Moskowitz was reached enabling petitioner to conduct business on the premises until such time as Dr. Moskowitz needed it for his redevelopment project. That petitioner did not vacate the premises for six years after the Agency's initial acquisition of the premises is irrelevant. The critical factor is not when the property was vacated but why it was vacated.

In this case, petitioner did not forfeit his eligibility for relocation payments by his continued subleasing of the premises from the Barthas after the Barthas entered into a postacquisition lease with Moskowitz. (*Albright v. State of California* (1979) 101 Cal.App.3d 14, 21 [161 Cal.Rptr. 317]; *Superior Strut & Hanger Co. v. Port of Oakland, supra,* 72 Cal.App.3d at p. 996.) This is not a case in which the tenant was ousted due to his failure to pay rent during his postacquisition subtenancy, breaching the landlord-tenant agreement, as in *Baiza v. Southgate Recreation & Park Dist.* (1976) 59 Cal.App.3d 669, 674 [130 Cal.Rptr. 836]. This also is not a case in which a

Lease shall terminate as to the part taken as of the date the condemning authority takes title or possession which ever occurs first."

tenant was forced to move due to the natural expiration of a master lease and thus the reversion of the right of possession of real property to its original governmental owner as in *Stephens v. Perry* (1982) 134 Cal.App.3d 748, 756-758 [184 Cal.Rptr. 701].)[6]

In reliance on *Peter Kiewit Sons' Co. v. Richmond Redevelopment Agency, supra,* 178 Cal.App.3d 435, the Agency argues that petitioner did not vacate the premises because of its acquisition of the property or its order to vacate. Rather, petitioner was required to vacate the premises because he unlawfully occupied the property after the expiration of his sublease. This argument is disingenuous and once again presupposes incorrectly that the original sublease did not terminate as a result of the taking.

In *Peter Kiewit,* a city redevelopment agency purchased a very large parcel of property, a portion of which was occupied by the plaintiff pursuant to a lease set to expire on March 31, 1980. The agency assumed all existing leases on the property. The plaintiff unsuccessfully attempted to negotiate an extension of its lease. The agency notified the plaintiff that if it intended to remain on the property past March 31, 1980, it would have to do so under a new lease. No new lease was executed, however. After failing to vacate the property by March 31, 1980, the plaintiff tendered to the agency the amount of rent it had been paying. The agency refused to accept the tendered payment and filed an unlawful detainer action. Prior to trial, the plaintiff vacated the property and the unlawful detainer action was settled. (*Peter Kiewit Sons' Co. v. Richmond Redevelopment Agency, supra,* 178 Cal.App.3d at pp. 438-439.)

The court concluded that the agency's acquisition of the property had been by purchase not condemnation and thus did not operate to terminate plaintiff's lease. The court further rejected the plaintiff's claim of entitlement to relocation benefits under the CRAL. The court observed "a tenant holding under a lease which has not expired at the time property is acquired for public use and who continues lawfully in possession of the premises after termination of the lease will qualify as a 'displaced person' under section 7260, subdivision (c)." (*Peter Kiewit Sons' Co. v. Richmond Redevelopment Agency, supra,* 178 Cal.App.3d at p. 445.)

Application of this rule led the court to conclude that plaintiff did not qualify as a displaced person. The court reasoned that "[w]hen the term of a

---

[6]Government Code section 7260, subdivision (c)(2)(A), provides that "[a]ny person who has been determined to be in unlawful occupancy of the displacement dwellings" is excluded from the definition of "displaced person." This statutory provision is inapplicable here, in that petitioner was not in possession of a "dwelling." Rather, he was in possession of commercial property.

lease expires but the lessee holds over without the owner's consent, he becomes a tenant at sufferance. [Citation.] 'Since the possession of the tenant at sufferance is wrongful, the owner may elect to regard the tenant as a trespasser . . . .' [Citation.] If instead the owner accepts rent from a tenant at sufferance he accepts the tenant's possession as rightful and the tenancy is converted into a periodic one. [Citations.] When defendant refused plaintiff's tender of rent defendant was electing to treat plaintiff's continued possession as unlawful." (*Peter Kiewit Sons' Co. v. Richmond Redevelopment Agency, supra,* 178 Cal.App.3d at p. 445.) The court concluded that the leasehold did not terminate as a result of the agency's acquisition of the property but rather terminated by its own terms. (*Ibid.*)

*Peter Kiewit* is factually distinguishable. It is undisputed that at the time the Agency acquired the premises, petitioner lawfully occupied the premises pursuant to an assignment of a sublease. However, unlike in *Peter Kiewit* and despite the Agency's protestations to the contrary in this case, the acquisition was effected by condemnation or the threat of condemnation, with the taking eventually resulting in the termination of the original master lease and the original sublease. Thereafter, petitioner was able to continue conducting his business on the premises as Frank Bartha's subtenant since Mr. Bartha and Dr. Moskowitz had executed a new lease agreement.

Although Dr. Moskowitz ultimately had to initiate unlawful detainer proceedings to effect petitioner's ouster, we conclude that petitioner did not forfeit his right to relocation benefits as a result. Petitioner's decision to remain on the premises in the face of Dr. Moskowitz's six months' notice of termination stemmed from petitioner's belief, whether right or wrong, that the lease between Frank Bartha and Dr. Moskowitz automatically had renewed for an additional one-year period due to Dr. Moskowitz's failure to terminate the lease six months prior to the end of the lease term. In any event, the crucial factor compelling the conclusion that petitioner is entitled to relocation benefits is the " 'causal connection between the acquisition [by the public entity] and the displacement.' " (*Peter Kiewit Sons' Co. v. Richmond Redevelopment Agency, supra,* 178 Cal.App.3d at p. 444.) The bottom line is that petitioner was required to move and thus was displaced for a public project. Inasmuch as petitioner established that he was a "displaced person" within the meaning of Government Code section 7260 and that the Agency had a clear, present, ministerial duty to pay him relocation benefits, his petition should have been granted.

### DISPOSITION

The order is reversed. On remand, the trial court is directed to vacate its order denying Veisna Kong's petition for writ of mandate, to enter a new

and different order granting the petition, and to determine the amount of relocation benefits to which petitioner is entitled under the California Relocation Assistance Law (Gov. Code, § 7260 et seq.). Petitioner is awarded his costs on appeal.

Ortega, J., and Mallano, J., concurred.