Filed 8/6/25 Certified for Publication 8/15/25 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| MAYRA GOMEZ,<br><br>       Petitioner,<br><br>   v.<br><br>THE SUPERIOR COURT OF SACRAMENTO COUNTY,<br><br>       Respondent;<br><br>THE PEOPLE<br><br>       Real Party in Interest. | C102211<br><br>(Super. Ct. No. 23FE014787) |

Petitioner Mayra Gomez seeks a petition for writ of mandate directing the trial court to vacate its order denying her application for mental health diversion (motion) under Penal Code[1] section 1001.36, filed in her pending criminal case for second degree

---

[1] Undesignated statutory references are to the Penal Code.

robbery. The trial court denied the motion on three grounds. First, the trial court found Gomez ineligible for diversion because the prosecution rebutted the presumption that her mental health disorders were a significant factor in the commission of the robbery. (§ 1001.36, subd. (b)(2).) Second, the court found Gomez unsuitable for diversion because she poses an unreasonable risk of danger to public safety if treated in the community. (§ 1001.36, subd. (c)(4).) Finally, the court exercised its residual discretion to deny the motion, even assuming Gomez satisfied the eligibility and suitability criteria, based on the nature of the offense and the injuries sustained by the victim.

Gomez asserts the trial court abused its discretion in denying her motion. We agree. Accordingly, we issue a peremptory writ directing the trial court to vacate its order denying mental health diversion and to enter a new order granting the motion.

LEGAL BACKGROUND

Effective June 27, 2018, the Legislature added sections 1001.35 and 1001.36, which promote and authorize trial courts to grant "pretrial diversion" to defendants diagnosed with qualifying mental disorders. (Stats. 2018, ch. 34, § 24.) In this context, " '[p]retrial diversion' means the postponement of prosecution, either temporarily or permanently, at any point in the judicial process from the point at which the accused is charged until adjudication, to allow the defendant to undergo mental health treatment, subject to [certain requirements]." (§ 1001.36, subd. (f)(1).) "The stated purpose of this legislation is to keep people with mental disorders from entering and reentering the criminal justice system while protecting public safety, to give counties discretion in developing and implementing diversion across a continuum of care settings, and to provide mental health rehabilitative services. [Citation.] The Legislature intended the mental health diversion program to apply as broadly as possible." (*People v. Whitmill* (2022) 86 Cal.App.5th 1138, 1149 (*Whitmill*).)

Effective January 1, 2023, section 1001.36 was amended by Senate Bill No. 1223 (2021-2022 Reg. Sess.) (Stats. 2022, ch. 735, § 1).[2] As amended, section 1001.36, subdivision (a) permits a trial court, after considering the parties' positions, to "grant pretrial diversion to a defendant pursuant to this section if the defendant satisfies the eligibility requirements for pretrial diversion set forth in subdivision (b) and the court determines that the defendant is suitable for that diversion under the factors set forth in subdivision (c)."

Section 1001.36, subdivision (b) sets forth two requirements that must be satisfied for a defendant to be eligible for mental health diversion. First, the defendant must have been "diagnosed with a mental disorder as identified in the most recent edition of the Diagnostic and Statistical Manual of Mental Disorders, including, but not limited to . . . post-traumatic stress disorder . . . . Evidence of the defendant's mental disorder shall be provided by the defense and shall include a diagnosis or treatment for a diagnosed mental disorder within the last five years by a qualified mental health expert." (§ 1001.36, subd. (b)(1).)

Second, the defendant's mental disorder must have been "a significant factor in the commission of the charged offense. If the defendant has been diagnosed with a mental disorder, the court shall find that the defendant's mental disorder was a significant factor in the commission of the offense unless there is clear and convincing evidence that it was not a motivating factor, causal factor, or contributing factor to the defendant's involvement in the alleged offense. A court may consider any relevant and credible evidence, including, but not limited to, police reports, preliminary hearing transcripts, witness statements, statements by the defendant's mental health treatment provider, medical records, records or reports by qualified medical experts, or evidence that the

_____

[2] The statute was amended again in 2024 and 2025; those amendments are not relevant here.

3

defendant displayed symptoms consistent with the relevant mental disorder at or near the time of the offense." (§ 1001.36, subd. (b)(2).)

If the defendant satisfies the statutory eligibility requirements, the court must next consider whether the defendant is suitable for pretrial diversion under the four criteria set forth in section 1001.36, subdivision (c), all of which must be met. Subdivision (c)(1) requires that "[i]n the opinion of a qualified mental health expert, the defendant's symptoms of the mental disorder causing, contributing to, or motivating the criminal behavior would respond to mental health treatment." Subdivision (c)(2) requires that the defendant consent to diversion and waive the right to a speedy trial or meet other requirements not pertinent here. Subdivision (c)(3) requires that the defendant agree to comply with treatment as a condition of diversion or meet other requirements not pertinent here. Finally, subdivision (c)(4) requires that the "defendant will not pose an unreasonable risk of danger to public safety, as defined in Section 1170.18, if treated in the community."

An unreasonable risk of danger to public safety as defined in section 1170.18, subdivision (c), means "an unreasonable risk that the [defendant] will commit a new violent felony" within the meaning of section 667, subdivision (e)(2)(C)(iv), which felonies are "colloquially referred to as 'super strikes.' " (*Whitmill*, *supra*, 86 Cal.App.5th at p. 1149.) "Those super strikes are murder, attempted murder, solicitation to commit murder, assault with a machine gun on a police officer, possession of a weapon of mass destruction, any serious or violent felony punishable by death or life imprisonment, or any sexually violent offenses or sexual offense committed against minors under the age of 14." (*Id*. at pp. 1150-1151.) In making the unreasonable risk of danger to public safety determination, the court "may consider the opinions of the district attorney, the defense, or a qualified mental health expert, and may consider the defendant's treatment plan, the defendant's violence and criminal history, the current

4

charged offense, and any other factors that the court deems appropriate." (§ 1001.36, subd. (c)(4).)

Even when the defendant makes a prima facie showing of meeting the statutory eligibility and suitability criteria, the court may nonetheless exercise its discretion to deny diversion. (*Sarmiento v. Superior Court* (2024) 98 Cal.App.5th 882, 892 (*Sarmiento*).) "But, this 'residual' discretion must be exercised ' "consistent with the principles and purpose of the governing law." ' [Citations.] That purpose includes a strong legislative preference for treatment of mental health disorders because of the benefits of such treatment to both the offending individual and the community. Where the court chooses to exercise this residual discretion to deny diversion, its statement of reasons should reflect consideration of the underlying purposes of the statute and explain why diversion would not meet those goals." (*Id.* at pp. 892-893.)

## FACTUAL BACKGROUND

### I

### *The Robbery*

Gomez is charged with one count of second degree robbery. The following facts regarding the robbery are taken from Exhibit 1, labeled as the prosecution's "Electronic File," and Exhibit 2, labeled as "Underlying police report(s)," both of which were attached to the prosecution's opposition to Gomez's motion.

The victim was walking on the side of the road when a Hispanic female and a Black male emerged from behind bushes yelling, "Gimme your shit." The male grabbed at the victim's backpack and a third person, a Hispanic male, hit the victim over the back of the head with what the victim believed to be a metal object. The prosecution's electronic file and the police reports diverge on what happened next.

The prosecution's electronic file states the Hispanic male hit the victim again, causing him to fall to the ground. The victim was able to get up and run away but believed "they were going to kill him" because the female said, "get his ass, kill his ass."

The Black male ran after the victim until the victim got to an overpass. The two other individuals "stayed in the same spot."

The police reports state the victim gave a statement after being transported to the hospital and said that, after he was hit over the head by the Hispanic male, the Hispanic female said, "get his ass, kill his ass." The victim responded, "don't kill me, you can take my stuff." The victim "was afraid they were going to kill [him]." The Hispanic male then hit the victim again with what the victim believed to be a metal object. After losing consciousness "for maybe a minute," the victim woke up and ran away. The Black male ran after the victim until the victim ran down an embankment and across the freeway, while the other two individuals stayed where they were.

The victim sustained a puncture wound to his left shoulder, a two-inch laceration to the back of the head with major swelling, and a three-inch laceration to his left wrist. The lacerations required five staples to the victim's left wrist and nine staples to the back of his head. The police later located suspects matching the descriptions given by the victim. Gomez was identified as the Hispanic female and charged with robbery.

II

*The Motion*

Gomez filed a pretrial motion seeking mental health diversion. The motion states Gomez was an unhoused woman who had experienced sexual abuse and witnessed domestic violence and substance abuse as a child. She was placed in foster care at age 13 and lived in group homes. She began experimenting with drugs around that time, which increased in severity into and throughout adulthood. As an adult, Gomez has experienced physical and emotional abuse, including sexual abuse. She "is particularly susceptible to manipulation by those around her" and "has a history of suicidal ideations and suicide attempts."

Gomez attached two documents to her motion—a crisis assessment completed by a senior mental health counselor at the Sacramento County Department of Behavioral

6

Health and a Brief Questionnaire for Initial Placement form (questionnaire). The questionnaire discusses Gomez's alcohol and drug abuse and identifies an initial placement recommendation for treatment in an intensive outpatient setting. As to recommendations for additional services, the questionnaire states "[c]o-occurring disorders/mental health evaluation is recommended" and "[r]ecovery environment support service needs should be evaluated (i.e., recovery residences, transitional housing, sober living environment [SLE])."

The following statements are taken from the crisis assessment completed by the counselor. Gomez has a history of alcohol and drug abuse, including use of fentanyl, cocaine, Ecstasy, and ketamine. She is "experiencing symptoms of depression, does not want to get out of bed, social withdrawal, past suicide ideations, anxiety, and taking unnecessary risks that put her in danger" and "demonstrates impaired functioning in areas of transportation, housing, [and] familial/interpersonal, parenting and social functioning." Gomez exhibits thoughts of harm without a plan but has no recent history of elevated risk factors. She does, however, "have a history of suicide attempts, violence, or threats, which may be associated with a disorganized mental state or substance abuse." Her symptoms and history indicate a diagnosis of posttraumatic stress disorder, major depressive disorder, and polysubstance use disorder.

Gomez self-disclosed that she was taking a psychotropic medication. The counselor prescribed her two additional medications to adjust for "anxiety/depressed mood" and noted that Gomez "endorses involvement in substance use treatment" and "is motivated to address her substance use and mental health in order to be reunified with her 2 children." Gomez agreed to intensive outpatient or residential substance use and prevention, as needed. In the safety plan and next steps portion of the crisis assessment, the counselor set forth Gomez's full diagnosis and stated Gomez "is being referred to mental health services at [a specified facility] which is the appropriate level of care."

## III

### *The Opposition*

The prosecution opposed mental health diversion on the ground that there was a lack of nexus between the robbery and Gomez's mental health disorders.  The prosecution relied on the police reports and argued there was no indication that Gomez was suffering from any symptoms of her mental disorders when the robbery occurred.  The prosecution further argued that Gomez was unsuitable for diversion because she poses an unreasonable risk to public safety if treated in the community based on the circumstances of the robbery and the injuries sustained by the victim.  The only exhibits attached to the prosecution's opposition were the prosecution's electronic file and the police reports.

## IV

### *The Hearing and Ruling*

On August 13, 2024, the trial court held a hearing on the motion.  Defense counsel argued Gomez had no criminal record and the crime occurred almost one year prior when Gomez was unhoused and living in a tent in the bushes where the robbery occurred.  Since then, Gomez had moved in with her mother, had made contact with a treatment program, and was trying "to get her act together."  Counsel explained Gomez was suffering from depression, substance abuse disorder and posttraumatic stress disorder, had a history of being in abusive relationships with men, and started using drugs around the time she was placed in foster care at age 13.  Counsel further asserted Gomez had a substance abuse problem and was suffering symptoms of depression at the time of the robbery, and she "was on drugs that day."  As to the robbery, counsel argued Gomez had a "very small, if any, part in" the offense, Gomez never touched the victim, and the victim reported Gomez only said, " 'Get him, kill him,' which no one was trying to do."  Regarding that statement, counsel indicated that Gomez denied saying those words and pointed out the victim did not report the statement attributed to Gomez in his first

8

interview with the police. Counsel further noted that none of the stolen property was found in Gomez's tent shortly after the robbery.

The prosecution first addressed the dangerousness criteria, arguing "[i]t is incredibly dangerous to be involved in a violent robbery where this victim is suffering significant injuries" and then say, " 'Kill him' "—"[t]hat is a danger." The prosecution argued Gomez's posttraumatic stress disorder was not a nexus to the crime because Gomez was not reacting to what she perceived as a danger, rather "she [wa]s the danger." As to Gomez's "[m]ajor depressive disorder," the prosecution argued that "the hallmarks of that, having no joy in life, having trouble functioning, fatigue" did not correlate to "someone who is jumping out of bushes to attack another human being with a group that is incredibly violent."

The trial court asked the prosecution how the court should weigh that Gomez had been out of custody for one year in terms of the risk she posed if treated in the community. The prosecution acknowledged it was something for the court to consider but stated it "doesn't mean she doesn't have a propensity to be involved in more violent actions again."

In rebuttal, defense counsel responded that the prosecution did not address Gomez's substance abuse disorder, which was the mental health condition at issue when she was "living in a tent . . . with an abusive man who uses drugs himself." Counsel further pointed to the recommendations in the questionnaire as evidence that the mental health professionals "understand [substance abuse] is the problem."

The trial court explained it was presumed that Gomez's mental disorder was a significant factor in the commission of the robbery and the prosecution had the burden to show by clear and convincing evidence that her mental disorders were not a motivating, causal, or contributing factor in the commission of the robbery. After detailing the evidence and factors that may be considered by the court in that regard, the trial court ruled: "The Court, after reviewing both the filings which include some of the discovery

9

and the initial police report in this case, facts and circumstances of the case, find that the Prosecution has met [its] burden of clear and convincing evidence that the mental health disorder was not a motivating factor or causal factor or contributing factor in the commission of the charged offense.

"There is no indication that she was suffering from a disorder at the time. The facts and circumstances, at least listed in the police report, and, again, this is not a preliminary hearing nor a trial, but indicate that the statements attributed to her was to kill the individual. The victim had to run across a freeway to stay away [and] was almost struck by a vehicle. [¶] The scene appeared to be a coordinated effort amongst numerous individuals. He suffered injuries. Laceration to the back of the head requiring nine staples, laceration to his left wrist requiring five staples, and a puncture wound to his shoulder."[3]

The trial court next considered whether Gomez would pose an unreasonable risk to public safety as defined in section 1170.18 if treated in the community. After detailing the evidence and factors that may be considered by the court in that regard, the trial court noted that Gomez has no known criminal history, and there was no evidence that she had committed any offense while living in the community since the robbery. The trial court, however, did not find those factors dispositive and ruled: "The Court, considering the facts that we've talked about before, the nature of this robbery, the fact that the -- he suffered those types of injuries, felt that he was in such danger that he had to run away across a freeway from these people and that she was -- is a listed co-defendant amongst

---

[3] Although the trial court verbally ruled that it denied mental health diversion because Gomez lacked eligibility under the significant factor criteria, the minute order states the court found Gomez eligible but not suitable for mental health diversion. It is further unclear what the trial court meant by its consideration of discovery included in the filings, because Gomez only produced the crisis assessment and questionnaire, and the prosecution only produced its own electronic file and the police reports.

10

the others, I'm not sure what her physical acts were . . . but the fact that she was part of this robbery, the Court does find that she does pose an unreasonable risk to public safety as defined in the Section 1170.18 even if treated in the community."

Finally, the trial court said it "would exercise [its] residual discretion" and "would find it inappropriate to grant her Mental Health Diversion under the facts and circumstances of this case." The trial court explained it understood the court was "not permitted to redefine public safety in a manner inconsistent with the Legislature's expressed intent, however, this person, through some period of time, had to suffer through this robbery where he was hit in the back of the head numerous times, again, having to get treatment for -- that included getting staples to his head, his left wrist, and was in such fear of his life was willing to risk his own safety by running across a freeway and almost getting hit by a vehicle." The trial court ruled that, "for those reasons," "even if all other factors were met, [the court] would still exercise [its] residual discretion to deny Mental Health Diversion for this applicant . . . at this time."

V

*The Petition for Writ of Mandate and Subsequent Procedural Background*

On October 14, 2024, Gomez filed a petition in this court seeking a peremptory writ of mandate directing the trial court to vacate its denial of mental health diversion and either enter an order granting the motion or show cause why the motion should not be granted. We requested that the Attorney General file a preliminary opposition to the petition, which he did. After we issued an order to show cause, the Attorney General filed a written return, and Gomez filed a reply brief. We now consider the merits of Gomez's petition.

DISCUSSION

To qualify for mental health diversion, Gomez must meet the two eligibility criteria under section 1001.36, subdivision (b), and the four suitability criteria set forth in subdivision (c) of that section. It is undisputed that Gomez meets the eligibility criterion

11

in subdivision (b)(1), relating to a diagnosis of a qualifying mental disorder, and the suitability criteria in subdivision (c)(2) and (c)(3), relating to her consent to diversion, waiver of her right to a speedy trial, and agreement to comply with treatment as a condition of diversion.

On appeal, Gomez challenges the trial court's findings that she does not meet the significant factor eligibility criterion under section 1001.36, subdivision (b)(2), and the public safety suitability criterion under subdivision (c)(4). The People contend the trial court did not err in finding Gomez ineligible and unsuitable for diversion under those criteria and further, albeit confusingly, assert that Gomez cannot demonstrate the court erred in finding she failed to meet the treatment suitability criterion under subdivision (c)(1)—a criterion not expressly addressed by the trial court or raised by the prosecution. The People also argue that, even if Gomez satisfies the eligibility and suitability criteria for mental health diversion, the trial court's exercise of its residual discretion to deny the motion should be upheld.

We conclude the trial court abused its discretion in denying the motion. Initially, however, we reject the People's argument that Gomez's petition is not properly before us for consideration on mandamus.

I

*Mandamus Review is Appropriate Under the Circumstances Presented*

A writ of mandate "must be issued in all cases where there is not a plain, speedy, and adequate remedy, in the ordinary course of law." (Code Civ. Proc., § 1086.) " ' " 'The question whether there is a "plain, speedy and adequate remedy in the ordinary course of law," within the meaning of the statute, is one of fact, depending upon the circumstances of each particular case, and the determination of it is a matter largely within the sound discretion of the court.' " ' " (*Flores v. Department of Corrections & Rehabilitation* (2014) 224 Cal.App.4th 199, 206.)

12

The People argue mandamus is inappropriate because the decision whether to grant diversion was a discretionary and not a ministerial act. (See § 1001.36, subd. (a) ["court may, in its discretion, and after considering the positions of the defense and prosecution, grant pretrial diversion to a defendant"].) Gomez disagrees with this assertion and further argues mandamus review is appropriate because waiting to appeal the ruling following her potential conviction is an inadequate remedy. We conclude mandamus review is appropriate under the circumstances presented.

It is true, as the People assert, that mandamus "is not available to compel the exercise of discretion on the part of a public official." (*Kong v. City of Hawaiian Gardens Redevelopment Agency* (2002) 101 Cal.App.4th 1317, 1326.) But mandamus is "available to correct an abuse of discretion." (*Ibid*.) That is because an abuse of discretion is not an exercise of discretion, but rather " ' "is action beyond the limits of discretion, and it is settled that [a] writ will issue to correct such abuse if the facts otherwise justify its issuance." ' " (*People v. Superior Court (Meraz)* (2008) 163 Cal.App.4th 28, 46.) Because Gomez contends the trial court abused its discretion when it denied her motion, mandate is available to correct that abuse, if such an abuse occurred.

Further, where, as here, "an order is not appealable, but is reviewable only upon appeal from a subsequent judgment, various factors, such as expense of proceeding with a trial and prejudice resulting from delay, may operate to make that remedy inadequate." (*Phelan v. Superior Court* (1950) 35 Cal.2d 363, 370.) The purposes of mental health diversion include "[i]ncreased diversion of individuals with mental disorders to mitigate the individuals' entry and reentry into the criminal justice system while protecting public safety" and to provide persons with mental disorders diversion that meets their treatment and support needs. (§ 1001.35, subds. (a), (c).) Pretrial diversion allows for postponement of prosecution to allow the defendant to undergo mental health treatment and dismissal of the criminal charges if the defendant performs satisfactorily in diversion. (§ 1001.36, subds. (f)(1), (h).) Thus, section 1001.36 offers persons with a qualifying

13

mental health disorder " ' "dramatically different and more lenient treatment." ' " (*People v. Doron* (2023) 95 Cal.App.5th 1, 7.)

Requiring Gomez to wait until resolution of an appeal following her potential conviction to correct the trial court's alleged abuse of discretion would be contrary to the purposes of section 1001.36 and preclude Gomez from receiving the timely mental health treatment intended by the Legislature. It could further entail a waste of time and funds through trial should she perform satisfactorily in diversion. Accordingly, in light of the statutory aims of the mental health diversion statute and the potential prejudice Gomez may suffer in the absence of prompt resolution of her claim, we conclude mandamus review is appropriate.

## II

### *The Trial Court Abused Its Discretion in Denying Mental Health Diversion*

A trial court's ruling on a request for mental health diversion is reviewed for abuse of discretion, and the court's factual findings are reviewed for substantial evidence. (*People v. Moine* (2021) 62 Cal.App.5th 440, 448-449.) "A court abuses its discretion when it makes an arbitrary or capricious decision by applying the wrong legal standard [citations], or bases its decision on express or implied factual findings that are not supported by substantial evidence." (*Id.* at p. 449.) A trial court further abuses its discretion if its decision "is so irrational or arbitrary that no reasonable person could agree with it." (*People v. Carmony* (2004) 33 Cal.4th 367, 377.)

A.      *The Finding That the Prosecution Rebutted the Significant Factor Presumption Is Not Supported by Substantial Evidence*

Gomez argues the trial court misapplied the significant factor presumption under section 1001.36, subdivision (b)(2) by finding, "without any mental health expert opinion to support its conclusions, that the facts and circumstances presented in the police reports did not tend to show that Gomez was suffering from a mental health illness when the offense occurred." Gomez asserts the trial court accordingly improperly shifted the

14

burden to her to prove her mental health disorders contributed to the offense. The People argue the trial court's finding is supported by the police reports and it was reasonable for the trial court to view Gomez's "actions as rooted in a violent, dangerous, clear-thinking and criminal mindset, rather than a result of her mental health disorders." We find no substantial evidence in the record to support the trial court's finding.

To rebut the presumption that a defendant's mental disorder was a significant factor in the commission of the charged offense, the prosecution must produce "clear and convincing evidence that it was not a motivating factor, causal factor, or contributing factor to the defendant's involvement in the alleged offense." (§ 1001.36, subd. (b)(2).) "When reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011.) "[W]e view the record in the light most favorable to the prevailing party below and give due deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Id.* at p. 996.)

The trial court found the prosecution met its burden to rebut the presumption based on the facts and circumstances of the robbery detailed in the police reports, the statement attributed to Gomez by the victim, the victim's significant injuries, and that the "scene appeared to be a coordinated effort amongst numerous individuals." But nothing in the police reports indicates that Gomez was *not* suffering symptoms or that her mental health disorders were *not* a motivating, causal, or contributing factor in the commission of the robbery. And nothing in the police reports indicates that Gomez planned or coordinated the robbery or that she was making "logical decisions" with a "clear-thinking" mindset, as the People contend. In contrast, the crisis assessment states that her

15

history of violence and threats "may be associated with a disorganized mental state or substance abuse."

At bottom, the trial court's finding that the prosecution rebutted the presumption was based on a lack of "indication [in the police reports] that she was suffering from a disorder at the time" of the robbery. As this court, however, recently explained, "the absence of evidence proving that [a] petitioner's mental disorder *was* a factor in the commission of the offenses is not substantial evidence supporting a finding by clear and convincing evidence that [the] petitioner's mental disorder *was not* a factor in the commission of the offenses." (*Lacour v. Superior Court* (2025) 110 Cal.App.5th 391, 404.) "By finding that the statutory presumption had been overcome by the mere *absence of evidence* demonstrating that [a] petitioner's mental illness *was* a factor in the alleged offenses, [a trial court] effectively shift[s] the burden to [the petitioner] to affirmatively prove that [his, her, or their] mental disorder contributed to the offenses." (*Ibid.*, first italics added.)

Because no substantial evidence supported the trial court's finding that the statutory presumption had been overcome by clear and convincing evidence, the denial of Gomez's motion was an abuse of discretion.

## B.    *Gomez Meets the Treatment Response Criteria*

The People argue Gomez cannot demonstrate that "the trial court erred in finding that she failed to prove that she was 'suitable' for diversion under section 1001.36, subdivision (c)(1)." The People's argument is confusing because the prosecution did not challenge Gomez's motion on that basis, the trial court made no such finding, and Gomez made no such argument in her petition. To the extent the People assert the criteria are unmet given the trial court's significant factor ruling, the argument lacks merit because that ruling is reversed, as explained *ante*. To the extent the People assert that, even if we agree with Gomez as to the arguments set forth in her petition, we nevertheless should

16

affirm because Gomez did not establish suitability under section 1001.36, subdivision (c)(1), we disagree.

Section 1001.36, subdivision (c)(1), provides a defendant is suitable for pretrial diversion if, in addition to three other factors, "[i]n the opinion of a qualified mental health expert, the defendant's *symptoms of the mental disorder* causing, contributing to, or motivating the criminal behavior would respond to mental health treatment." (Italics added.) In the crisis assessment attached to Gomez's motion, the counselor noted that Gomez self-disclosed that she was taking a psychotropic medication and the counselor prescribed additional medication to adjust for "anxiety/depressed mood." In the safety plan and next steps portion of the crisis assessment, the counselor further set forth Gomez's full diagnosis and stated Gomez "is being referred to mental health services at [a specified facility] which is the appropriate level of care." The crisis assessment thus shows the counselor identified and recommended a plan to treat Gomez's symptoms of posttraumatic stress disorder, major depressive disorder, and polysubstance use disorder—the mental disorders establishing Gomez's eligibility for mental health diversion under section 1001.36, subdivision (b). The criteria under section 1001.36, subdivision (c)(1), were thus satisfied.

C. *The Unreasonable Risk of Danger Finding Is Not Supported by Substantial Evidence*

Gomez argues there is no substantial evidence that she will pose an unreasonable risk of danger if treated in the community because she has no criminal record, and her conduct was significantly less egregious than the defendant's conduct in *Whitmill*, *supra*, 86 Cal.App.5th 1138, in which such a finding was reversed. The People argue the trial court's ruling "was hardly irrational" given the police reports showed Gomez "personally engaged in violent conduct." The relevant question is whether there is substantial evidence to support a finding that Gomez is likely to commit a super-strike offense if treated in the community. (*People v. Hoffman* (2015) 241 Cal.App.4th 1304, 1310; see

17

*People v. Moine*, *supra*, 62 Cal.App.5th at p. 450 ["a trial court necessarily must find the defendant is 'likely to commit a super-strike offense' " to deny diversion on this ground; in other words, "the risk of danger is narrowly confined to the likelihood the defendant will commit a limited subset of violent felonies"].)  We conclude the answer is "no."

First, Gomez has no criminal history and hence there is no evidence she has a prior super-strike conviction.  (*People v. Hoffman*, *supra*, 241 Cal.App.4th at p. 1310 [finding the record did not support a finding of dangerousness under § 1170.18, subd. (c) where the defendant had no prior criminal history].)  There is also no evidence that Gomez has previously been charged with a super-strike offense.  Second, the pending robbery charge is not a super-strike offense.  Although the victim stated he was afraid that Gomez and her codefendants would kill him, there was no evidence (or argument presented) that Gomez ever touched the victim or attempted to commit a super-strike offense during the commission of the robbery.  Finally, at the time of the hearing, Gomez had been out in the community for approximately one year and there is no evidence that any new charges had been filed against her for committing another offense.  There accordingly is no evidence to support a finding that Gomez was *likely* to commit a super-strike offense if treated in the community and the trial court abused its discretion.

D.    *The Trial Court's Exercise of Its Residual Discretion Is Inconsistent With the Principles and Purposes of the Mental Health Diversion Statute*

The People argue that, even if we were to find that Gomez meets the eligibility and suitability criteria for diversion, Gomez would not be entitled to pretrial diversion because the trial court exercised its residual discretion to deny diversion based on "the violent nature of her crime, and the serious injuries she and her co-defendants caused to the victim."  Gomez correctly points out, however, that " '[w]here the court chooses to exercise [its] residual discretion to deny diversion, its statement of reasons should reflect consideration of the underlying purposes of the statute and explain why diversion would

18

not meet those goals.' " (Citing *Sarmiento*, *supra*, 98 Cal.App.5th at p. 892.) The trial court's statement of reasons reflects no such consideration or explanation.

"A trial court's denial of mental health diversion using its residual discretion should be limited to those situations where the purposes of the statute would not be achieved." (*Vaughn v. Superior Court* (2024) 105 Cal.App.5th 124, 138.) The stated purpose of mental health diversion " 'is to keep people with mental disorders from entering and reentering the criminal justice system while protecting public safety, to give counties discretion in developing and implementing diversion across a continuum of care settings, and to provide mental health rehabilitative services.' " (*Ibid.*) "That purpose includes a strong legislative preference for treatment of mental health disorders because of the benefits of such treatment to both the offending individual and the community." (*Sarmiento*, *supra*, 98 Cal.App.5th at pp. 892-893.)

Here, instead of focusing on the purpose of the diversion statute and explaining why diversion would not meet those goals, the trial court denied diversion under its residual discretion based solely on the facts and circumstances of the robbery, including the injuries sustained by the victim. The facts and circumstances of the robbery were, however, considered under the unreasonable risk of dangerousness criteria of the statute. The trial court cannot invoke its residual discretion to create a lower standard for finding that the facts and circumstances of the robbery indicate diversion would not protect public safety. (See *Sarmiento*, *supra*, 98 Cal.App.5th at p. 896 ["In the guise of exercising its 'residual' discretion, a court is not permitted to redefine public safety in a manner inconsistent with the Legislature's expressed intent"]; *id.* at p. 897 ["Expanding the reasons to deny diversion would also be inconsistent with the legislative purposes sought to be achieved in enacting sections 1001.35 and 1001.36"].) Although the trial court noted that it was "not permitted to redefine public safety in a manner inconsistent with the Legislature's expressed intent," that is in essence what the trial court did. The trial court thus abused its discretion.

19

## DISPOSITION

Let a peremptory writ of mandate issue directing the respondent court to vacate its order denying the application for mental health diversion and to enter a new order granting the application.

/s/
BOULWARE EURIE, J.

We concur:

/s/
EARL, P. J.

/s/
MESIWALA, J.

20

CERTIFIED FOR PUBLICATION


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----


| | |
|---|---|
| MAYRA GOMEZ, | C102211 |
| Petitioner, | |
| | (Super. Ct. No. 23FE014787) |
| v. | |
| THE SUPERIOR COURT OF SACRAMENTO COUNTY, | ORDER CERTIFYING OPINION FOR PUBLICATION |
| Respondent; | |
| THE PEOPLE | |
| Real Party in Interest. | |


ORIGINAL PROCEEDING in mandate. Petition granted.

Gina C. Teddington for Petitioner.

No appearance for Respondent.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Senior Assistant Attorney General, Christopher J. Rench and Jamie A. Scheidegger, Deputy Attorneys General, for Real Party in Interest.

The opinion in the above-entitled matter filed on August 6, 2025, was not certified for publication in the Official Reports.  For good cause it now appears the opinion should be published in the Official Reports, and it is so ordered.


FOR THE COURT:


        /s/
EARL, P. J.


        /s/
BOULWARE EURIE, J.


        /s/
MESIWALA, J.